UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

GREEN VALLEY INVESTMENT LLC,

        Plaintiff,

        v.                              Case No. 08-C-0706

COUNTY OF WINNEBAGO,

        Defendant.

## AMENDED DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 12) AND DISMISSING CASE

        Green Valley Investments, LLC, filed this action against the County of Winnebago, pursuant to 42 U.S.C. § 1983 alleging that §§ 17.13 (6)(b)(9), 17.13 (6)(c) and 17.25 of the County's Zoning Code unconstitutionally regulate its First Amendment expression. It asserts that the Ordinance violates the First and Fourteenth Amendments in the following ways: 1) § 17.13 is facially unconstitutional because it is vague and overbroad; 2) together §§ 17.13 and 17.25 are an unconstitutional prior restraint; and 3) in combination §§17.13 and 17.25 are facially unconstitutional because they do not meet the requirements of a time, place and manner regulation of expression. The County seeks summary judgment and dismissal of the case contending that the Ordinance is a constitutional exercise of its zoning powers. For the reasons set forth below, the County's motion will be granted in part and denied in part and this case will be dismissed.

The County is a Wisconsin unit of local government with a capacity to sue and be sued. (Stip. of Facts, ¶ 1.) Green Valley is a Wisconsin limited liability corporation with the capacity to sue and be sued. (Stip. of Facts, ¶ 2.) Green Valley owns the property at 14131 Green Valley Road in the Town of Neenah, Winnebago County, Wisconsin, and has operated a tavern, known as Stars Cabaret, there since July 2006. (Stip. of Facts, ¶¶ 3-4.)

Stars Cabaret is licensed by the City of Neenah to sell alcoholic beverages and its liquor license must be renewed annually. (Stip. of Facts, ¶¶ 5-7.) Each day that it has been open since July 25, 2006, Stars Cabaret has presented exotic or nude dance entertainment for its customers. (Stip. of Facts, ¶¶ 8-9.)

According to Wis. Stat. § 59.69, the County has the authority to enact zoning ordinances to, among other things, protect and promote the general welfare, health and safety of its citizens, protect property values and promote orderly land use development. (Stip. of Facts, ¶ 13.) The Winnebago County Zoning Code controls land use and all lands within the geographic limits of the Township of Neenah, including Green Valley's premises. (Stip. of Facts, ¶ 14.) When Stars Cabaret opened, the Winnebago County Zoning Code regulated adult expression by creating an Adult Entertainment Overlay District (AEO), which applied to any "adult establishment." (Stip. of Facts, ¶ 15.)

---

[1] Most of the facts have been derived from the Stipulation of Facts submitted by the parties on February 10, 2009. *See* Doc. # 47. There are facts mentioned later in this Decision and Order that come directly from the Ordinance and of which the court takes judicial notice. *See* Fed. R. Evid. 201; *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456(7th Cir. 1998) ("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper.")

The Ordinance was passed on August 21, 2007, and was published on October 27, 2007. (Stip. of Facts, ¶ 23.) After it received sufficient votes from the Town Boards of the affected communities, it was enacted by the Winnebago County Board. (Stip. of Facts, ¶ 24.) Later in August 2007, the County Clerk sent the Ordinance to Town Clerks. (Stip. of Facts, ¶ 25.) No Town Board communicated any objection to the County Board after the Ordinance was passed. (Stip. of Facts, ¶ 26.)

The Ordinance provides a moratorium permitting adult entertainment establishments, such as Stars Cabaret, to continue nonconforming uses in substantially the same manner for one-year from the date of its enactment. (Stip. of Facts, ¶ 28.) Section 17.13(6)(c)12 permanently exempts existing businesses, like Stars Cabaret, from a 600-foot setback applicable to adult entertainment establishments. This section provides:

> Amortization. Any adult entertainment establishment lawfully operating as of August 21, 2007, which is in violation of this section shall be deemed a nonconforming use. The nonconforming use shall be permitted to continue in substantially the same manner for a period not to exceed one (1) year from the enactment of this section unless sooner terminated for any reason, voluntarily discontinued or brought into compliance with this section. After one year, the owner or operator of any adult entertainment business must comply with the provisions of this section. The existing structure(s) and the use contained therein, shall be exempt from the 600-ft setback requirements of this section. Any expansion of the existing structure(s) and the use contained therein shall adhere to the 600 ft setback requirements of this section.

(Stip. of Facts, ¶ 34.) On November 13, 2007, the Winnebago County Assistant Zoning Administrator sent Green Valley a letter advising that after one year from enactment of the Ordinance, Stars Cabaret must be rezoned as an AEO and would require a conditional use

-3-

permit to operate lawfully at its current location.  (Stip. of Facts, ¶ 29.)  In a clarifying letter to Green Valley, dated August 29, 2008, Winnebago County Corporation Counsel, John A. Bodnar, stated that enforcement of the Ordinance would be held in abeyance for one year from the Ordinance's publication date, October 27, 2007.  (Stip. of Facts, ¶ 30.)

The County's primary concern in enacting the Ordinance was to reduce the secondary effects associated with adult entertainment businesses.  (Stip. of Facts, ¶ 35.) In developing the Ordinance, the County, reviewed and utilized a study entitled "Everything You Always Wanted to Know About Regulating Sex Businesses," by Eric Damian Kelly and Connie Cooper.  (Stip. of Facts, ¶ 36.)  In drafting the Ordinance, Winnebago County's Planning and Zoning Committee (the Committee) held a public hearing on May 29, 2007, to take testimony concerning the impact, if any, of adult entertainment businesses and the appropriate regulations.  (Stip. of Facts, ¶ 37.)  Green Valley's representatives, including Attorney Jeff Scott Olson, appeared and spoke in opposition to the Ordinance.  (Stip. of Facts, ¶ 38.)

The Ordinance states that it does not intend "to suppress any speech activities protected by the First Amendment, but to enact a regulation that addresses the negative secondary effects of adult entertainment businesses . . . ."  (Stip. of Facts, ¶ 39.) The Ordinance sets forth its purpose as:

> It is the purpose of this section to regulate adult entertainment businesses in order to promote the health, safety, and general welfare of citizens of Winnebago County, and to establish reasonable and uniform regulations to prevent the deleterious location and concentration of adult entertainment businesses within Winnebago County. The provisions of this section have neither the purpose nor effect of imposing a limitation or restriction on the content of any communicative materials, including adult materials. Similarly, it is neither the intent nor

effect of this section to restrict or deny access by adults to sexually oriented materials protected by the First Amendment, or to deny access by the distributors and exhibitors of adult entertainment to their intended market. Neither is it the intent nor effect of this section to condone or legitimize the distribution of obscene material.

(Stip. of Facts, ¶ 40.)

According to §17.13(6)(c)(4)(c), an "adult cabaret" is an adult establishment.

An "adult cabaret" is defined as:

A nightclub, dance hall, bar, restaurant, or similar commercial establishment which regularly features:
(a) Persons who appear semi-nude; or
(b) Live performances that are characterized by the exposure of "specified sexual activities" or "specified anatomical areas"; or
(c) Films, motion pictures, video cassettes, streaming videos, DVDs, slides or other photographic reproductions which are characterized by the exhibition or display of "specified sexual activities" or "specified anatomical areas."
(d) This definition shall expressly exclude films, motion pictures, video cassettes, slides or other similar photographic reproductions given an "R" or "NC-17" rating by the Motion Picture Association of America.

(Stip. of Facts, ¶¶ 41, 51-52.)  The definition of "adult cabaret" expressly excludes "films, motion pictures, video cassettes, slides or other similar photographic reproductions given an "R" or "NC-17" rating by the Motion Picture Association of America.  (Stip. of Facts, ¶ 53.)  The Ordinance excludes from regulation theaters, performing arts centers, civic centers, and dinner theaters where live dance, ballet, music and dramatic performances of serious artistic merit are offered on a regular basis and establishments in which the predominant business or attraction is not the offering of entertainment intended for sexual interests or titillation of customers and where the establishment is not distinguished by an emphasis on or the advertising or promotion of nude or semi-nude performances.  (Stip.

of Facts, ¶ 54.) It places no restrictions on the clothing to be worn by entertainers in adult cabarets. (Stip. of Facts, ¶ 55.) The Ordinance mandates that the hours of operation for adult cabarets be the same as the hours of operation for bars and taverns within the community in which they are located. (Stip. of Facts, ¶ 56.)

"Regularly features" is defined as "a consistent or substantial course of conduct, such that the films or performances exhibited constitute a substantial portion of the films or performances offered as part of the ongoing business of the adult establishment." (Stip. of Facts, ¶ 42.) "Characterized by" is defined as "the dominant or principal theme of the object referenced. For instance, when the phrase refers to films 'which are distinguished or characterized by an emphasis upon the exhibition or display of specified sexual activities or specified anatomical areas,' the films so described are those who dominant or principal character and theme are the exhibition or display of 'specified sexual activities' or 'specified anatomical areas.'" (Stip. of Facts, ¶ 43.) "Specified sexual activities" is defined as "(1) fondling of another persons genitals, pubic region, anus or female breasts; (2) actual sex acts, normal or perverted, including intercourse, oral copulation, masturbation, or sodomy; or (3) excretory functions as a part of, or in connection, any of the activities set forth in (1) through (2) above." (Stip. of Facts, ¶ 44.) "Specified anatomical areas" is defined as "(1) the human male genitals in a discernibly turgid state, even if completely and opaquely covered; or (2) less than completely and opaquely covered human genitals, pubic region, vulva, anus or the nipple and areola of the human female breast." (Stip. of Facts, ¶ 45.) "Semi-Nude" is defined as "the showing of the human male or female genitals, public area, vulva or anus with not more than a

complete opaque covering, or the showing of the female breasts with not more than a complete opaque covering of any part of the nipple or areola." (Stip. of Facts, ¶ 46.)

The Ordinance prohibits any person, employee, entertainer or patron from having any physical contact with any entertainer on the premises of an adult entertainment business during any performance, and, to prevent such physical contact, requires that all performances occur on a stage or table elevated at least eighteen (18) inches above the immediate floor level and not less than three (3) feet from any areas occupied by any patron, such that no patron shall be less than five (5) feet from any entertainer during any performance, including during the payment of a tip or gratuity. (Stip. of Facts, ¶ 47.) It also precludes more than one "adult use" on any one parcel and requires that any "adult use" be at least 600 feet from the establishment of any other "adult use." (Stip. of Facts, ¶ 48.) The Ordinance bars any "adult use" within 600 feet of any land zoned residential or institutional, a residential planned unit development, farm dwelling, a private educational facility, including but not limited to any child daycare establishment, nursery school, preschool, kindergarten, elementary school, junior high school, middle school, high school, vocational school, secondary school, continuation school, special education school, junior colleges and universities, as well as any municipally owned public park or recreational area designed for park or recreational activities, which is under the control, operation or management of Winnebago County and recreational authorities. (Stip. of Facts, ¶ 49.) Section 17.13 (6)(c)(6) provides that no "adult use" shall be permitted within 600 feet of any premise that sells or disburses alcohol or is licensed pursuant to the alcoholic beverage control regulations of the state. (Stip. of Facts, ¶ 50.) However, it also recognizes that the local municipality where the adult entertainment business is located may be in a position

to evaluate the extent of the secondary effects given the unique characteristics of the municipality and, accordingly, permits the municipalities to enact a resolution allowing alcohol in adult establishments within their boundaries.  (Stip. of Facts, ¶ 57.)

Under the Ordinance, adult establishments may be lawfully located only within an AEO. (Stip. of Facts, ¶ 58.)  An AEO may only be created within an HB Highway Business District, which is itself an overlay district of the B-3 General Business District. (Stip. of Facts, ¶ 59.)  The Winnebago County Zoning Code provides that an overlay zone (or overlay district) is a set of requirements set forth in the text of the Ordinance that are imposed  "in addition to those of the underlying district."  (Stip. of Facts, ¶ 60.)  Section 17.13(6)(c)(6)(a) states that an AEO shall be established only by conditional use permit and only where the underlying district is a Highway Business District Overlay.  (Stip. of Facts, ¶ 61.)

Section 17.13(6)(c)(7) provides: "[n]o principal uses shall be permitted as a matter of right in the Adult Entertainment Overlay District. All uses shall be conditional uses."  (Stip. of Facts, ¶ 62.)  An AEO in a B-3 HB District is a "conditional" or "special" use that requires review, public hearing and approval in accordance with § 17.25 of the Winnebago County Zoning Ordinance.  (Stip. of Facts, ¶ 63.)  A prospective owner of an adult entertainment business must obtain a conditional use permit from the Committee. (Stip. of Facts, ¶ 64.)  Approval of the application for a conditional use permit requires compliance with § 17.25 and the following findings: (1) the standards and requirements of § 17.13(6)(c) have been met; (2) the proposed zoning change is consistent with the general intent of any comprehensive plan in existence; and (3) the existing streets and utilities are adequate for the proposed use. (Stip. of Facts, ¶ 65.)

The Conditional Use Application, which comports with the terms of § 17.25, requires an applicant to disclose a variety of site-related information. (Stip. of Facts, ¶¶ 66-67, 73-74.) Additional, more detailed information may be required from an applicant at the sole discretion of the Committee or the County Zoning Administrator. (Stip. of Facts, ¶¶ 69, 72.)

Section 17.25 requires the Committee to hold a public hearing on each application for a conditional use permit. (Stip. of Facts, ¶ 75.) Section 17.02(3) instructs the Committee and the County Board of Adjustment to "prepare and adopt a public hearing schedule which sets forth … monthly application deadlines, monthly public hearing dates and monthly deliberation dates." (Stip. of Facts, ¶ 76.) According to § 17.25, the Committee "shall fix a reasonable time and place" for the public hearing that is required to follow receipt of an application for a conditional use permit. When an application is received, the hearing is scheduled for the next monthly meeting, provided there is time to comply with the notice requirements in §§ 17.25(1)(d) and 17.25(2)(a). If there is insufficient time to provide the required notice, the hearing is scheduled for the following month. (Stip. of Facts, ¶ 82.) No explicit provision in §§ 17.25 or 17.13 (6)(c) requires the Committee to initiate a public hearing within any specific number of days after receipt of an application for a conditional use permit. (Stip. of Facts, ¶ 83.)

For many years, the Committee has adopted, on an annual basis, a schedule for meetings, public hearings and conditional use decisions. (Stip. of Facts, ¶ 77.) When an application is received, the Committee's practice is to schedule the hearing for the next monthly meeting, provided that there is time to comply with §§17.25(1)(d) and 17.25(2)(a)'s notice requirements. If there is insufficient time, the hearing is scheduled for the following

month. (Stip. of Facts, ¶ 78.) For example, under the 2008 Planning and Zoning Committee Schedule, an application for a conditional use permit submitted on or before August 31, 2008, would be the subject of a public hearing on October 30, 2008, and have an anticipated decision date of November 3, 2008. (Stip. of Facts, ¶ 79.) On those rare occasions when a Committee member(s) or court reporter had a conflicting meeting, the hearing and related decision were rescheduled within a week earlier or later to maintain a monthly hearing schedule. (Stip. of Facts, ¶ 80.) The portion of the hearing for a specific item on the agenda may be postponed until the next month's hearing calendar at the request of the applicant or a town where the town's input is appropriate in accordance with § 17.25(1)(b). (Stip. of Facts, ¶ 81.)

Sections 17.25 and 17.13 (6)(c) do not prohibit the Committee from adjourning a public hearing that has been initiated to consider an application for a conditional use permit and concluding the hearing at some future date. (Stip. of Facts, ¶ 84.) During the past ten (10) years, the Committee has adjourned some public hearings that were initiated to consider an application and has concluded those hearings on a later date. (Stip. of Facts, ¶ 85.)

Section 17.25 (3)(a) requires the Committee to deny, approve, or give conditional approval of the conditional use permit application within forty (40) days of the conclusion of the public hearing. (Stip. of Facts, ¶ 86.) Where a conditional approval has been given, the Committee must finalize the action within ninety (90) days from the conclusion of the public hearing. (Stip. of Facts, ¶ 87.)

Section 17.25 (1)(d) provides that the Committee is required to give notice by a Class 2 Notice according to Wis. Stat. Ch. 985 to all property owners within 300 feet

-10-

of the subject site at least ten (10) days prior to the hearing. (Stip. of Facts, ¶88.) The applicant is obligated to allow county staff to enter the property for the purpose of placement and removal of the notice of hearings sign, for viewing the property prior to the hearing, and for conducting an inspection to determine compliance with the terms and conditions, if any, of the permit granted. (Stip. of Facts, ¶¶ 89, 91.) Notice must also be mailed to the Town Clerk of the affected town. (Stip. of Facts, ¶90.)

Under § 17.25, the Town Board should attend the hearing and may then, or earlier, indicate its position with regard to granting, denying, granting in part, or conditionally approving the application. (Stip. of Facts, ¶ 92.) If the Town requests an extension of time within which to determine its position, an extension of time of at least a minimum of one (1) week must be granted automatically. (Stip. of Facts, ¶ 93.) In the event the Town does not communicate its position on an application, before or at the hearing, it shall be deemed to have approved whatever action the Committee may take. (Stip. of Facts, ¶ 94.) In determining the length of an extension to be granted, the Committee shall take into account the complexity and importance of the matter, the diligence of the applicant in submitting the application, and the need of the applicant and the area for a prompt decision. (Stip. of Facts, ¶ 95.)

All conditional uses are required to be in accordance with the purpose and intent of § 17.25 and "shall not be hazardous, harmful, offensive, or otherwise adverse to the environmental quality, water quality, shoreland cover, or property values in the County and its communities." (Stip. of Facts, ¶ 103.) Pursuant to § 17.25, in deciding whether to grant or to deny an application for a conditional use permit, the Committee shall also be guided by a review of the site, existing and proposed structures, architectural plans,

neighboring land and water uses, parking areas, driveway locations, highway access, traffic generation and circulation, drainage, waste disposal, water supply systems, and the effect of the proposed use on flood damage protection, water quality, shoreland cover, natural beauty, and wildlife habitat. (Stip. of Facts, ¶ 104.) Conditions may be required by the Committee upon its finding that those are necessary to fulfill the purpose and intent of the Ordinance, such as landscaping; architectural design; type of construction; construction commencement and completion dates; sureties; lighting; fencing; location, size, and number of signs; water supply and waste disposal systems; higher performance standards; street dedication; certified survey maps; floodproofing; ground cover; diversions; silting basins; terraces, stream bank protection; planting screens; operational control; hours of operation; improved traffic circulation; deed restrictions; highway access restrictions; increased yards; or additional parking. (Stip. of Facts, ¶ 105.) According to § 17.25 (2)(b)(4), if the Town and the Committee approve the application subject to certain conditions, and those conditions are not identical, the more restrictive conditions apply. (Stip. of Facts, ¶ 102.)

Section 17.25 (4)(a) states that in the case of "certain uses, the character of which could have substantial adverse effect upon the surrounding environment and general character of the County by reason of the appearance of the structures, arrangement or use of the land," the applicant may be required to submit building site and operational plans for approval of the Committee. (Stip. of Facts, ¶ 71.) In such cases, the Committee is required take into consideration certain specified additional factors as well as "any others they deem appropriate," and a public hearing and town notification shall not be necessary

unless the Committee finds that such application requires public review for adequate evaluation. (Stip. of Facts, ¶¶ 106-07.)

Under § 17.25, the Town or the Committee may unilaterally deny an application for a conditional use permit (except that the Town may not deny an application in areas such as shoreland where state statutes give such power exclusively to the County or the State). (Stip. of Facts, ¶ 96.) The Ordinance states that a Town action for approval or denial should be accompanied by Findings of Fact. (Stip. of Facts, ¶ 97.) A Town action submitted without Findings of Fact shall be returned with a request to provide Findings of Fact within thirty (30) days. (Stip. of Facts, ¶ 98.) The failure of a Town to submit Findings of Fact within thirty (30) days shall constitute unconditional approval of the application. (Stip. of Facts, ¶ 99.) All findings of fact submitted to support a Town action approving or denying a conditional use permit are required to address, at a minimum, any duly adopted Comprehensive Plans, adopted ordinances, if any, compatibility or non-compatibility with adjacent uses, specific substantiated objections, if any, plus any other specific finding deemed appropriate for the matters at hand. (Stip. of Facts, ¶ 100.) Section 17.25 requires all Town findings to be based upon the evidence within a record in support thereof. (Stip. of Facts, ¶ 101.)

The Ordinance contains a severability clause, which provides:

Severability. Any provisions stated in this section are hereby declared to be independent divisions and subdivisions, not withstanding any other evidence of legislative intent, it is hereby declared to be the controlling legislative intent that if any provision of this section, or the application thereof to any person or circumstances, is held to be invalid, the remaining sections or provisions, and the application of such remaining sections and provisions to any person or circumstances whatsoever, shall not be effected thereby, and it is hereby

> declared that such remaining sections and provisions would
> have been passed independently of the section or provision so
> held to be invalid.

(Stip. of Facts, ¶ 109.)

On July 14, 2008, the Township of Neenah's Board declined to act on Stars Cabaret's request that the Board exempt Stars Cabaret from the Ordinance's ban on the sale of alcoholic beverages. (Stip. of Facts, ¶ 31.) Moreover, Green Valley has not sought a conditional use permit to operate an adult entertainment business. (Stip. of Facts, ¶ 32.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure

-14-

to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

DISCUSSION

<u>Standing</u>

As an initial matter, the court must decide whether Green Valley has standing to bring this action. The County argues in its initial brief that Green Valley lacks standing for two reasons: 1) it cannot show an injury in fact; and 2) its allegations are too bare bones for application of the overbreadth doctrine exception to the standing requirement. Green Valley responds that it is not relying on the overbreadth exception. It asserts that it has shown an injury in fact by establishing a restriction of its right to free expression, which is a constitutional injury. In addition to pressing forward with its assertion that it would be inappropriate for the court to apply the overbreadth exception, the County argues in its reply brief that Green Valley lacks standing because it is "unclear how a favorable ruling...will redress [plaintiff]'s real injury, which is Stars' inability to continue operating in its current manner, i.e., offering nude dancing with alcohol and tipping." Winnebago County's Reply Br. In Supp. of Mot. for Summ. J., 5. In response to the redressability argument,[2] Green Valley contends that its one and only basis for standing has always been that its injury is the restriction of its right to free expression, that the restriction is directly

_____

[2] Because the redressability issue was not initially argued, the court allowed Green Valley to file a surrebuttal brief. *See Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670, 675-76 (7th Cir. 2008); *Mattek v. Duetsche Bank Nat. Trust Co.*, ___ F.Supp.2d ___, 2011 WL338801, *3 (E.D. Wis. Jan. 28, 2011).

caused by the Ordinance it is seeking to have declared unconstitutional and that such a declaration will redress the injury as it will no longer have the restriction.

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court announced the minimum test the party seeking to invoke federal jurisdiction must satisfy to prove standing.  The party must demonstrate 1) it has "suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;" 2) there is "a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court;" and 3) it is "likely as opposed to merely speculative that the injury will be redressed by a favorable decision."  *Id.* at 560-61.  "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at successive stages of the litigation."  *Id.* at 561.  At this stage of the proceedings, the plaintiff "must set forth...specific facts...which for purposes of the summary judgment motion will be taken to be true."  *Id.*

To establish standing, Green Valley sets forth the following specific facts:[3] 1) it owns the property at 14131 Green Valley Road in the Town of Neenah, Winnebago County, Wisconsin and has operated a tavern, known as Stars Cabaret, there since July 2006; 2) each day that it has been open since July 25, 2006, Stars Cabaret has presented

---

[3] Facts 1-8 have been taken from the findings of fact above.  The court takes judicial notice of # 9 from the October 17, 2008, Court Minutes entered at Doc. # 25.

exotic or nude dance entertainment for its customers; 3) at the time that the Stars Cabaret opened, the Winnebago County Zoning Code regulated adult expression by creating an Adult Entertainment Overlay District ("AEO"), which applied to any "adult establishment;" 4) according to the Ordinance, an "adult cabaret" is an adult establishment; 5) the Ordinance was passed on August 21, 2007, and published on October 27, 2007; 6) the Ordinance provides a moratorium permitting adult entertainment establishments, like Stars Cabaret, to continue nonconforming uses in substantially the same manner for a one-year period from its enactment; 7) on November 13, 2007, the Winnebago County Assistant Zoning Administrator sent Green Valley a letter informing it that, after a year from Ordinance's enactment, Stars Cabaret had to be rezoned as an AEO and must have a conditional use permit to operate at its current location; 8) in a August 29, 2008, letter to Green Valley, Winnebago County Corporation Counsel, John A. Bodnar, stated that enforcement of the Ordinance would be held in abeyance for a year from October 27, 2007; 9) although the time for the moratorium has run, the County agreed that it would not seek to enforce the Ordinance during the pendency of this summary judgment motion.

Courts have held that "[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Fairchild v. Liberty Independent School District*, 597 F.3d 747, 754, (5th Cir. 2010) (quoting *Houston Chronicle Publ. Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007). *See also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (concluding in the preliminary injunction context that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Carey v. Piphus*, 435 U.S. 247, 254 (1978) (discussing damages awarded under § 1983 for violations of constitutional rights). In the instant case, Green

Valley has shown with specific facts that its right of free expression has been concretely and imminently threatened by the County as a result of the Ordinance. It has established that it engages in constitutionally protected expression, that the County has enacted an ordinance that attempts to restrict such expression, and that absent the pending litigation, the Ordinance would be enforced against it. This action seeks a decision in favor of Green Valley that declares the Ordinance unconstitutional and invalidates any restriction that it places on Green Valley's freedom of expression. Consequently, Green Valley has satisfied the standing test.

Prior Restraint

The County maintains that § 17.13 is aimed at regulating the negative secondary effects associated with adult entertainment businesses and that the court should analyze the entire Ordinance as a time, place and manner regulation. Moreover, it contends that the conditional use permitting portion of the Ordinance should be scrutinized using this standard because it is a constitutionally legitimate licensing scheme. Green Valley asserts that the Ordinance acts as a prior restraint upon its protected expression, that it is facially and presumptively unconstitutional, and that it is subject to a strict constitutional test.

Facial challenges are permitted where a licensing scheme vests discretion in the decision maker. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. at 223. As explained by the Seventh Circuit Court of Appeals, challenges of this type are permitted because such schemes enable officials to self-censor protected expression. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1044 (7th Cir. 2002). In *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750 (1998), the United States Supreme Court set forth the test to determine when

a First Amendment facial challenge may be made to a licensing scheme. *Id.* at 755-56. First, "a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* at 759. Second, "the law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.* Significantly, the court wrote that when a licensing statute allegedly vests unbridled discretion in a government official, "one *who is subject to the law* may challenge it facially without the necessity of first applying for, and being denied, a license." *Id.* at 755-56 (emphasis added).

Consistent with *Lakewood*, Green Valley alleges that taken together §§ 17.13 and 17.25 are a facially invalid prior restraint to its protected First Amendment expression because it must obtain a conditional use permit to operate its adult entertainment business legally. A zoning ordinance is an unconstitutional prior restraint if it: (1) vests the governmental decision maker with unbridled discretion to determine whether it will issue the permit or license; or (2) fails to place limits on the time within which the governmental decision maker must make the permit or licensing determination. *See FW/PBS, Inc., v. City of Dallas*, 493 U.S. 215, 225-26 (1990). "Courts addressing such laws must assure themselves that the necessary procedural safeguards are in place to protect the exercise of First Amendment rights. An initial safeguard is objective criteria. . . . A second safeguard is specific, reasonable time limits." *Kraimer v. City of Schofield*, 342 F.Supp.2d 807, 814 (W.D. Wis. Oct. 28, 2004).

Here, the governmental bodies appear to have the unbridled discretion that concerned the Court in *FW/PBS*. According to § 17.13 (6)(c)(10)(b) approval of the application to operate an adult entertainment business requires compliance with § 17.25 and the following findings: (1) the standards and requirements of § 17.13(6)(c) have been met; (2) the proposed zoning change is consistent with the *general intent of any* comprehensive plan in existence; and (3) the existing streets and utilities are adequate for the proposed use. *See* Stip. of Facts, ¶ 65 (emphasis added). Section 17.25 (2)(c) sets forth the standards by which the Committee "shall be guided." Although the Ordinance provides the Committee with some objective standards, such as those stated in subparagraphs (2)-(5), subparagraph (1) allows the Committee too much discretion while reviewing and deciding whether to approve or deny a conditional use permit. As noted above, the Conditional Use Ordinance provides that all conditional uses must be in accordance with the *purpose and intent* of § 17.25 and "shall not be *hazardous, harmful, offensive*, or otherwise adverse to the environmental quality, water quality, shoreland cover, or property values in the County and its communities." *See* Stip. of Facts, ¶ 103 (emphasis added). However, § 17.25 does not contain an explanation of its purpose and intent similar to § 17.13 (6)(c)(1)-(3). Moreover, the Ordinance does not offer the Committee or Town guidance respecting the proper considerations in determining whether proposed conditional uses will be hazardous, harmful or offensive.

Further, § 17.25 (4)(a) provides that in the case of "certain uses, the character of which could have substantial adverse effect upon the surrounding environment and general character of the County by reason of the appearance of the structures, arrangement or use of the land," the applicant may be required to submit building site and

operational plans for approval of the Committee. *See* Stip. of Facts, ¶ 71. Section 17.25 (4)(c) states that in such cases the Committee is required to take into consideration specified additional factors as well as *"any others they deem appropriate*." *See* Stip. of Facts, ¶ 106 (emphasis added). However, allowing a Committee member or Town Board member to take into account any other factor he or she deems appropriate does not provide specific objective guidelines that a court can use to ensure that the decision is constitutionally sound. For example, a member of the Committee or Town Board opposed to nude dancing on principal could cite §§ 17.25 (2)(c)(1) and/or (4)(c) as reasons to deny an applicant's conditional use permit. This is exactly the type of unbridled discretion that concerns courts in determining whether licensing and permitting schemes act as unconstitutional prior restraints. *See Kraimer*, 342 F.Supp.2d at 817 (stating that "[t]he ordinance's standards do not 'provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech.'") It does not appear that § 17.13 as it relates to the conditional use permitting process and § 17.25 contain the objective criteria necessary to satisfy the FW/PBS test.

Moreover, there is no time frame set out in § 17.25 for making the permitting decision. Section 17.25 (1)(d) provides that the Committee "shall fix a reasonable time and place" for the public hearing that is required to follow receipt of an application for a conditional use permit. *See* Stip. of Facts, ¶ 82. Once an application is received, it is the Committee's practice to schedule a hearing for the next monthly meeting, provided there is time to comply with notice requirements in §§ 17.25(1)(d) and 17.25(2)(a). If there is insufficient time to provide the required notice, the hearing is scheduled for the following

month.  *See* Stip. of Facts, ¶ 82.  However, neither § 17.13 or § 17.25 requires the Committee to initiate a public hearing within a set number of days following receipt of an application.  *See* Stip. of Facts, ¶ 83.  Nor is there an explicit provision of the Ordinance that prohibits the Committee from adjourning a public hearing that has commenced to consider an application and concluding the hearing at an uncertain date far in the future.  *See* Stip. of Facts, ¶ 84.  Further, according to § 17.25 (2)(b)(2), if the Town requests an extension of time within which to determine its position, at least a one (1) week extension must be granted automatically.  *See* Stip. of Facts, ¶ 93.

Although § 17.25 (3)(a) does set out specific time limits for the Committee to issue its decision after a public hearing has concluded, it is clear that § 17.25 is devoid of time limits within which the Committee must hold the public hearing that forms the basis for its decision.  Consequently, this is "[a] scheme that fails to set reasonable time limits on the decisionmaker [and] creates the risk of indefinitely suppressing permissible speech."  *FW/PBS*, 493 U.S. at 227.

<u>Time, Place and Manner Restriction</u>

The County asserts that § 17.13 (6) is aimed at regulating the negative secondary effects associated with adult entertainment businesses and that it is an appropriate time, place and manner regulation.  On the other hand, Green Valley maintains that the entire regulatory scheme unconstitutionally restricts its First Amendment freedom of expression and should be subject to a strict constitutional test.

The prohibitions and restrictions set forth in § 17.13 (6)(c)[4] are constitutional if:

> (1) the State is regulating pursuant to a legitimate governmental power; (2) the regulation does not completely prohibit adult entertainment; (3) the regulation is not aimed at the suppression of expression, but rather at combating the negative secondary effects caused by adult entertainment establishments; and (4) the regulation is designed to serve a substantial government interest, narrowly tailored, and reasonable alternative avenues of communication remain available, *or* alternatively, the regulation furthers an important or substantial government interest and the restriction on expressive conduct is no greater than is essential in furtherance of that interest.

*Ben's Bar, Inc., v. Village of Somerset*, 316 F.3d 702, 722 (7th Cir. 2003) (internal citations omitted, emphasis in original). In *Ben's Bar*, the Seventh Circuit affirmed the district court's grant of summary judgment to the Village that had enacted an ordinance similar to § 17.13 (6)(c)(6). *See id.* at 728. The ordinance regulated adult entertainment businesses' hours of operation, location, distance between patrons and performers, and prohibited the sale of alcohol, among other things. *See id.* at 705-06. Ben's Bar appealed only the district court's conclusion that the prohibition of the sale or consumption of alcohol on the premises of adult entertainment businesses was constitutional. *See id.* at 707.

As to the first prong of the test, it is clear that § 17.13 (6)(c)(6)'s prohibitions are within the County's general police and zoning powers. The Court of Appeals concluded that "the Village's regulation of alcohol sales and consumption in 'inappropriate locations' is clearly within its general police powers." *Id.* at 722. Moreover, in *G.M. Enterprises, Inc. v. Town of St. Joseph,* 350 F.3d 631 (7th Cir. 2003), the Seventh Circuit

---

[4] Excluding the portions of the Ordinance relating to the conditional use permitting scheme, which the court has found to be unconstitutional.

affirmed a district court's grant of summary judgment in favor of a town that had enacted an ordinance prohibiting the sale of alcohol and any physical contact between patrons and performers. The Court of Appeals held that although it was an issue of first impression for this circuit, "physical contact is beyond the scope of the protected expressive activity of nude dancing." *Id.* at 636. *See also Sensations Inc., v. City of Grand Rapids*, 526 F.3d 291, 299 (6th Cir. 2008).

Supreme Court precedent supports a finding that the remaining provisions of the Ordinance fall within the County's zoning and police powers. In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), the Supreme Court considered an ordinance regulating the locations of adult entertainment businesses and held that such regulation is within a city's zoning power. *See City of Renton*, 475 U.S. at 47-48. In its ruling, the Court found that the City's "zoning interests [were] unrelated to the suppression of free expression. The Ordinance by its terms is designed to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life. . . ." *Id.* at 48 (internal quotation marks and brackets omitted).

Notably, § 17.13 (6)(c)(6) does not completely prohibit adult entertainment and the Ordinance includes a statement that its purpose is combating the harmful secondary effects of the adult entertainment establishments. Therefore, the prohibitions in the Winnebago County Zoning Code are properly scrutinized as a time, place and manner restriction and subject to intermediate scrutiny. *See Ben's Bar*, 316 F.3d at 723-24.

The final determination that must be made is whether § 17.13 (6)(c)(6) is designed to serve a substantial government interest and narrowly tailored, and whether there are reasonable alternative avenues of communication available, *or* alternatively, whether § 17.13 (6)(c)(6) furthers an important or substantial government interest and the restriction on expressive conduct is no greater than is essential to further that interest. To reach this conclusion, courts "are required to ask whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." *Id.* at 724.

The parties agree that the primary concern underlying the enactment of § 17.13 was the reduction of the secondary effects associated with adult entertainment businesses. *See* Stip. of Facts, ¶ 35. The County reviewed and utilized a study entitled "Everything You Always Wanted to Know About Regulating Sex Businesses," by Eric Damian Kelly and Connie Cooper while drafting the Ordinance. *See* Stip. of Facts, ¶ 36.) When the Ordinance was being developed, the Committee held a public hearing and heard testimony concerning the impact, if any, of sexually oriented businesses and the appropriate regulations. *See* Stip. of Facts, ¶ 37. The County found "[t]hat the testimony at the public hearing of those working in the adult entertainment industry in Winnebago County indicated that a number of them had experienced past problems with criminal or other similar deleterious activities in adult entertainment establishments wherein they had previously worked." § 17.13 (6)(c)(6)(I). Further, the County concluded "[t]hat the existence of adult entertainment businesses may increase the occurrence of unlawful sexual activities, thus having a deleterious effect on the existing and surrounding commercial and residential area, thus resulting in a downgrading of property values as well

-25-

as causing an increase in criminal activity. The serving or presence of alcohol within such establishments is likely to heighten the potential occurrence of such deleterious effects on the surrounding area." § 17.13 (6)(c)(6)(j).

Section 17.13 (6)(c)(1) adds that the County determined that: 1) adult entertainment businesses are frequently used for unlawful sexual activities; 2) the concern over sexually transmitted diseases is a legitimate health concern demanding reasonable regulation to protect the health and well-being of the citizens; and 3) convincing documented evidence existed that adult entertainment businesses have a deleterious effect on the existing businesses around them and the surrounding residential areas adjacent to them, causing increased crime and the downgrading of property values. It goes on to advise that the County desired "to minimize and control these adverse secondary effects and thereby protect the health, safety and welfare of the citizenry, protect the citizens from increased crime, preserve the quality of life, preserve the property values and character of surrounding neighborhoods, and deter the spread of urban blight...," while not "suppress[ing] any speech activities protected by the First Amendment. . . ." § 17.13 (6)(c)(1).

The combination of the study and the testimony from Stars Cabaret's employees and others at the public hearing provided the County with evidence relevant to the problem it claims to address through enactment of the Ordinance. *See City of Renton*, 475 U.S. at 50-52. Consequently, this court is satisfied that the County has demonstrated a connection between the expression regulated by the Ordinance and the secondary effects that form the motivation for it.

Furthermore, § 17.13 (6)(c)(6) is narrowly tailored, leaving available reasonable alternative avenues of communication, or alternatively, restricting expressive conduct in no greater way than is essential to further the County's interest. None of the restrictions in § 17.13 (6)(c)(6) will impose any limitation on Stars Cabaret's performers' ability to express themselves through the First Amendment right to dance nude. Indeed, the restrictions placed on the adult entertainment businesses by § 17.13 (6)(c)(6) do not relate to the act of performing. Also, there is no First Amendment right to serve alcohol while presenting protected nude dancing. *See Ben's Bar*, 316 F.3d at 726. And, bans on touching, hours of operation, location/distance, and the number of establishments have been upheld as restricting expressive conduct in no greater way than is essential to further the government's interest, if at all. *See G.M. Enterprises, Inc.,* 350 F.3d at 636 (alcohol and touching); *Sensations Inc.,* 526 F.3d at 299 (touching and hours of operation); *City of Renton*, 475 U.S. at 54-55 (location/distance); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) (number of establishments). Although Stars Cabaret may be impacted economically by § 17.13 (6)(c)(6), "[t]he inquiry for First Amendment purposes is not concerned with economic impact." *City of Renton*, 475 U.S. at 54 (quoting *id.* at 78, Powell, J., concurring). Finally, the Ordinance contains limiting language so that it is not overbroad. *See* § 17.13 (6)(c)(11).

### Severability

The County asserts that any portion(s) of the Ordinance found to be unconstitutional by this court can be severed from the remainder because of a severability clause and that the licensing provision of the Ordinance is independent of the other restrictions. Green Valley disagrees and contends that the Ordinance cannot be saved by

severance because to do so would be contrary to the intent of the legislature, violate the separation of powers doctrine as well as comity concerns and leave in place a zoning scheme with no place for adult entertainment businesses to locate.

Under Wisconsin law, a court may sever the unconstitutional portion of a statute or ordinance to leave intact the remainder of the legislation. *See State v. Janssen*, 219 Wis.2d 362, 379, 580 N.W.2d 260, 267 (Wis. 1998). The question of whether the unconstitutional portion of the Ordinance is severable is largely one of legislative intent, but the presumption is in favor of severability. *See id.*

> In determining whether a defective section of an ordinance fatally infects the remainder of the law, a court should look to the legislative intent, particularly whether "the legislature would be presumed to have enacted the valid portion without the invalid portion." If a statute contains distinct parts and the offending parts can be extracted while leaving intact a "living, complete law capable of being carried into effect...the valid portions must stand."

*City News & Novelty, Inc., v. City of Waukesha*, 231 Wis.2d 93, 120, 604 N.W.2d 870, 884 (Wis. Ct. App. 1999) (quoting *City of Madison v. Nickel*, 66 Wis.2d 71, 79, 223 N.W.2d 865, 869 (Wis. 1974)). The Wisconsin Supreme "[C]ourt has held, in accordance with the general rule elsewhere, that the existence of a severability clause, while not controlling, is entitled to great weight in determining whether valid portions of a statute or ordinance can stand separate from any invalid portion." *Nickel*, 66 Wis.2d at 80, 223 N.W.2d at 870.

Here, it is clear that the Ordinance includes a severability provision. *See* Stip. of Facts, ¶ 109. Hence, the Ordinance reflects the County's intent that a problematic provision may be severed. Such intent is due great deference and weight in determining whether the permitting scheme at issue is severable from the remaining portions of the

Ordinance. However, this is not the end of the inquiry as the court must establish whether the remaining sections of the Ordinance are distinct from the unconstitutional parts and whether the County would have enacted the valid portions of the Ordinance without the invalid portions.

As stated above, the purpose for § 17.13 (6)(c) is "to regulate adult entertainment businesses in order to promote the health, safety, and general welfare of citizens of Winnebago County, and to establish reasonable and uniform regulations to prevent the deleterious location and concentration of adult entertainment businesses within Winnebago County." § 17.13 (6)(c)(2). The County concluded after weighing the "convincing documented evidence that adult entertainment business have...deleterious effect[s]...," that it should "minimize and control these adverse secondary effects and thereby protect the health, safety and welfare of the citizenry, protect the citizens from increased crime, preserve the quality of life, preserve the property values and character of surrounding neighborhoods, and deter the spread of urban blight...," while not "suppress[ing] any speech activities protected by the First Amendment. . . ." § 17.13 (6)(c)(1). Moreover, the Ordinance states that the County determined "[t]hat the existence of adult entertainment businesses may increase the occurrence of unlawful sexual activities, thus having a deleterious effect on the existing and surrounding commercial and residential area, thus resulting in a downgrading of property values as well as causing an increase in criminal activity. The serving or presence of alcohol within such establishments is likely to heighten the potential occurrence of such deleterious effects on the surrounding area." § 17.13 (6)(c)(6)(j).

This information establishes that the County's primary concern in enacting this Ordinance was controlling the secondary effects that it believes results from adult entertainment businesses.  Most notable is the conclusion that "[t]he serving or presence of alcohol within such establishments is likely to heighten the potential occurrence of such deleterious effects on the surrounding area."  § 17.13 (6)(c)(6)(j).  Therefore, the County has proven that the restrictions in §§ 17.13 (6)(c)(6)(b)-(q) would have been enacted even without the unconstitutional conditional use permitting scheme.

Without the permitting scheme codified as § 17.25 and the portions of § 17.13 (6) mentioning the necessity of obtaining a conditional use permit,[5] the remaining subsections of § 17.13 (6) can operate effectively.  Thus, Green Valley's arguments to the contrary are unavailing.  First, that the Ordinance was passed by multiple Town Boards and supervisors does not mean that severance is against the legislative intent.  The severability clause was in the Ordinance as approved and passed by the majority of those bodies.  If it were not their intent to allow for unconstitutional portions to be severed, the severability provision would not have been enacted as part the Ordinance.  Second, the court is not performing a drastic reconstruction or undertaking a substantial rewriting of the Ordinance

---

[5] A portion of § 17.13 (6)(b)(9) references the need for a conditional use permit, therefore, "only following Conditional Use approval as required by that Section" is stricken. The portion of § 17.13 (6)(c)(6)(a) mentioning conditional use permit is stricken so that it shall read "[t]he Adult Entertainment Overlay District shall only be established in situations in which the underlying district is a B-3 Highway business District."  Sections 17.13 (6)(c)(7), 17.13 (6)(c)(8) and 17.13 (6)(c)(10)(a) are stricken inasmuch as they relate to and/or require conditional use permits.  Finally, the portion of § 17.13 (6)(c)(10)(b) referring to compliance with the provisions of § 17.25 is stricken so that it shall read "[n]o application for an Adult Entertainment Overlay District shall be approved by the committee unless the following findings have been made: . . . ."

as asserted by Green Valley.[6]  Indeed, the court is merely striking the permitting scheme and the portions of § 17.13 (6) referring to the need for a conditional use permit.

Finally, deleting the requirement of a conditional use permit from § 17.13 (6)(b)(9) does mean that there will not be any place in the County for adult entertainment businesses to locate.  Section 17.13 (6)(b)(9) states that uses that are allowed within the AEO are principal uses in a highway business district (HB) overlay.  Section 17.13 is entitled B-3 General Business District.  Section 17.13 (6)(c) provides that "the AEO [adult entertainment overlay district] shall only be located as an overlay zoning district within the B-3 (HB) District."  § 17.13 (6)(c), 17-47.  Therefore, as long as adult entertainment businesses are allowed to be located within the AEO, meaning they comply with the remaining portions of § 17.13 (6)(c) and the overlay requirements for the B-3 (HB) District, such businesses can be located within the B-3 (HB) District.[7]

For these reasons,

IT IS ORDERED that Winnebago County's motion for summary judgment is granted in part and denied in part.

IT IS FURTHER ORDERED that Winnebago County is permanently enjoined from requiring the necessity of a conditional use permit and from enforcing § 17.25 and any portion of § 17.13 (6) relating to obtaining a conditional use permit.

_____

[6] The court acknowledges that this severance does terminate a large portion of the challenged Ordinance, which some may consider drastic.  However, any permitting scheme in place must comport with the Constitution and the remaining sections still allow the County to regulate the secondary effects that formed the basis for the Ordinance.

[7] This is not a new requirement as the overlay with the B-3 (HB) District has been a part of the Ordinance since its enactment.

IT IS FURTHER ORDERED that this case be dismissed.

Dated at Milwaukee, Wisconsin, this 15th day of July, 2011.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U.S. DISTRICT JUDGE